UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION


JAMES CHRISTOPHER MILLER, )
)
Petitioner, )
)
v. ) No. 1:18-CV-86
)
ELIZABETH COFER MILLER, )
)
Respondent. )


## MEMORANDUM OPINION

This matter is before the Court on Petitioner's Motion for Preliminary Injunction [doc. 8], Petitioner's Amended Petition for Return of Children to Canada [doc. 38], Petitioner's Trial Brief [doc. 24], Respondent's Amended Trial Brief [doc. 43], Respondent's Proposed Findings of Fact and Conclusions of Law [doc. 53], and Petitioner's Proposed Findings of Fact and Conclusions of Law [doc. 54]. For the reasons herein, the Court will deny the Petition and the Motion for Preliminary Injunction.

### I.    BACKGROUND

Petitioner James Christopher Miller brings this case under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 24, 1980, T.I.A.S. No. 11670. [Am. Pet., doc. 38]. Mr. Miller claims that his wife, Respondent Elizabeth Cofer Miller, has wrongfully retained their three children in Chattanooga, Tennessee, away from their

habitual residence in Humboldt, Saskatchewan, Canada. [*Id.* ¶¶ 4, 33, 37]. Mr. Miller requests preliminary injunctive relief[1] and the children's return to Canada. [*Id.* ¶¶ 32–44].

Within a week of receiving Mr. Miller's Petition, the Court set an expedited trial on the merits and informed the parties that it would consolidate the trial with the preliminary-injunction hearing. *See* Fed. R. Civ. P. 65(a)(2) ("[T]he court may advance the trial on the merits and consolidate it with the hearing.").[2] It recently concluded the trial, which lasted roughly a day and a half, and the parties have filed their post-trial briefs and proposed findings of fact. Having carefully reviewed and considered these materials, it is now prepared to issue its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately.").

## II. FINDINGS OF FACT

Mr. Miller and Mrs. Miller have been married for nine years and are the biological parents of J.M.M. A.B.M., and C.J.M., who were born in 2007, 2010, and 2012,

---

[1] Mr. Miller originally requested a temporary restraining order rather than a preliminary injunction. [Pet'r's Mot. TRO, doc. 8]. After observing in the record that Mrs. Miller received notice of the requested temporary restraining order, the Court converted it to a motion for a preliminary injunction and scheduled a trial, without objection from either party. *See MLZ, Inc. v. Fourco Glass Co.*, 470 F. Supp. 273, 275 (E.D. Tenn. 1978) ("The plaintiff applied for a temporary restraining order. . . . [T]he adverse party had notice and, in fact, was present at and participated in the hearing . . . . [A]ccordingly, the Court treated the application as one for a preliminary injunction." (citation omitted)); *see also Levas & Levas v. Vill. of Antioch*, 684 F.2d 446, 448 (7th Cir. 1982) ("[N]o TRO was being sought ex parte . . . . The court could and did treat the application as one for a preliminary injunction." (citing *id.*)).

[2] With child-abduction cases under the Hague Convention, this Court's general practice has been to consolidate the trial on the merits with the preliminary-injunction hearing. *Ahmed v. Ahmed*, No. 3:16-CV-142, 2016 WL 4691599, at *1 (E.D. Tenn. Sept. 7, 2016); *Guevara v. Soto*, 180 F. Supp. 3d 517, 522 (E.D. Tenn. 2016); *see* Hague Convention, art. 11 (providing that courts must "act expeditiously in proceedings for the return of children").

respectively. [Tr., doc. 51, 238:19–20; J.M.M. Birth Certificate, doc. 38-2, at 2; A.B.M. Birth Certificate, doc. 38-3, at 2; C.J.M. Birth Certificate, doc. 38-4, at 2]. Each of the three children was born in Chattanooga. [J.M.M. Birth Certificate at 2; A.B.M. Birth Certificate at 2; C.J.M. Birth Certificate at 2]. Their grandmother on their mother's side lives in Chattanooga, and their grandparents on their father's side live in Atlanta, which is roughly a two-hour drive from Chattanooga. [Tr. at 139:20–25; 218:23–25; 219:1]. On their mother's side, their great grandmother also lives in Chattanooga, as do several of their aunts, uncles, and cousins. [*Id.* at 224:13–23].

In 2013, Mr. Miller and Mrs. Miller mutually decided to move their family from Chattanooga to Humboldt, Saskatchewan, Canada, to pursue economic opportunities and to avoid creditors associated with a failed business venture that Mr. Miller had launched in Chattanooga. [*Id.* at 150:20–25; 151:1–2; 159:22–25; 160:1–6; 237:11–25]. They also mutually envisioned the move as a "five-year plan," which meant that after five years they planned to reevaluate their decision to relocate to Canada and determine whether they wanted to live there for a longer time. [*Id.* at 150:20–25; 151:1–2; 238:1–2]. After the Millers completed the move in May 2013, they eventually settled into a rental house in Humboldt, where J.M.M. had his own bedroom and A.B.M. and C.J.M shared a bedroom. [*Id.* at 11:21–23; 85:15–25; 86:1–6]. The children also had a playroom and a backyard, and there was a playground across the street. [*Id.* at 12:25; 13:1–11]. At the time, J.M.M. was six years old, A.B.M. was three years old, and C.J.M. was five and a half months old. [*Id.* at 235:17–20].

The Millers began to build their life in Canada. As a family, they applied for permanent resident status. [*Id.* at 106:21–25; 107:1–2]. Mr. Miller obtained employment in the construction industry. [*Id.* at 62:7–8]. Mrs. Miller also obtained employment, though she was principally the children's caretaker. [*Id.* at 239:25; 240:286:9–14]. The two oldest children, J.M.M. and A.B.M., enrolled in school, while the youngest, C.J.M., remained with Mrs. Miller or under a babysitter's supervision. [*Id.* at 91:23–25; 92:1–3; 240:2–9]. Mr. Miller and Mrs. Miller also enrolled the children in Canadian healthcare plans. [*Id.* at 92:4–16; *see* Pet'r's Ex. 1, at 1–6; Pet'r's Ex. 2, at 1–3].

As for the children's social lives and activities, the children made friends in their neighborhood and through participation in sports programs. [Tr. at 14:24–25; 15:1–9; 55:16–25; *see* Pet'r's Ex. 5 at 2, 4–6]. J.M.M. became well-known by neighbors and picked vegetables from their yards, [Tr. at 16:14–17], and the children viewed a pair of local family friends, Michael and Sherry Kwasnica, as their surrogate grandparents and referred to them as "grandpa" and "grandma," [*id.* at 155:16–18; 207:3–6]. According to Mr. Kwasnica, he and his wife are the "Canadian version" of their grandparents who reside in the United States. [*Id.* at 207:5–6]. Outside of interactions with friends in the neighborhood, J.M.M. and A.B.M. played youth-league ice hockey, though C.J.M. was too young for it. [*Id.* at 61:14–21; Pet'r's Ex. 4, at 1–8]. The children also took part in numerous outdoor activities, including Ducks Unlimited,[3] canoeing, camping, quadding,

---

[3] A.B.M. and C.J.M were not old enough to participate officially in Ducks Unlimited, but they did accompany J.M.M. to the organization's activities. [Tr. at 90:10–16].

kayaking, and ice fishing. [Tr. at 89:21–25; 90:1–25; 91:1–22; Pet'r's Ex. 5, at 2, 5; Pet'r's Ex. 6, at 1–227].[4]

The Miller family's transition to life in Canada, however, was not without its hardships. Mr. Miller sensed that Mrs. Miller was depressed and not coping well with being away from her family. [Tr. at 151:6–12]. Their marriage suffered, and Mr. Miller knew it was "on the rocks." [*Id.* at 109:23]. They had lengthy discussions about their marital problems, and at one point, in February 2017, Mrs. Miller told Mr. Miller that they were "headed for a divorce." [*Id.* at 242:5–16]. In the throes of their capsizing marriage, Mrs. Miller was eager for her family's company. [*Id.* at 241:4–11]. According to Mr. Miller, she issued an ultimatum to him: she was going to leave Canada and return to Chattanooga with or without him. [*Id.* at 110:1–3]. In response, Mr. Miller agreed that he, Mrs. Miller, and the children would leave Canada together as a family, hoping that the move would buoy their marriage, [*id.* at 110:15–22; 149:5–8; 151:6–12], though the uncertainty of the situation felt like "a death sentence" to him, [Resp't's Ex. 13, at 29].

The family began preparing for the move. They rented two U-Haul trucks, which they fully loaded with their belongings—including all the children's belongings—and they sold or gave away anything that did not fit into the trucks. [Tr. at 33:17–25; 34:1; 149:5–8; 197:17–20; 199:13–14; 256:9–16]. They also packed the ATV and the canoe they used for quadding and canoeing, respectively. [*Id.* at 199:4–7]. The Millers' friends threw farewell parties for them. [*Id.* at 197:21–24; 198:11–22; 257:12–22]. At one of

---

[4] The record is not clear as to how C.J.M., as a mere toddler, meaningfully engaged in these activities.

these parties, the Bunkos, another pair of local family friends, gave the Millers pillows in the shape of Saskatchewan, as a going-away gift so that the Millers would never forget them. [*Id.* at 150:7–11; 198:11–22]. Their friends also helped them empty and clean their house. [*Id.* at 57:8–13; 64:24–25; 65:1–2; 149:13–14; 256:15–17]. The Millers canceled their utilities. [*Id.* at 256:20–21]. They returned the house keys to the owner. [*Id.* at 111:2–3]. Mr. Miller quit his job. [*Id.* at 149:9–10]. On September 19, 2017, the Millers left Canada for Chattanooga.[5] During the trip, Mrs. Miller asked Mr. Miller for all the passports, and he surrendered them to her. [*Id.* at 112:8–17].

As for the children's personal sentiments about leaving Canada for Chattanooga, the record is murky at best. The children did not appear at the trial. In their place, numerous lay witnesses for both parties testified about how, based on their own perceptions, they believed the children felt about the move. For instance, Mr. Miller's mother, Anna Miller, offered her opinion that the children "loved" Canada, "didn't seem to be very happy here in Chattanooga," and "loved their sports [in Canada], their ice hockey." [*Id.* at 24:6–7; 29:5–6; 56:12]. Similarly, Michael Castle, who has been a longtime friend of Mr. Miller and appeared as his witness, [*id.* at 69:8–19], testified that he believed the children, shortly after they had returned from Canada, "didn't like being in Chattanooga," and he stated that they "spoke so . . . much about what they wanted

---

[5] Around this time, Mr. Miller and Mrs. Miller chose to enroll C.J.M in school, but because of the move to Chattanooga, his enrollment lasted for only a brief period—two and a half days, according to Mrs. Miller. [*Id.* at 30:5–10; *see* Resp't's Ex. 15, at 1].

back in Canada," [*id.* at 73:16–19].[6] But Lorrie Bunko, a friend of the Millers who testified as Mrs. Miller's witness, claimed the children were "excited" and "pumped" to leave Canada for Chattanooga. [*Id.* at 200:3–4].[7] Similarly, through Mrs. Miller's eyes, the children were "incredibly excited" when they received the news about the move because "they truly missed home." [*Id.* at 257:23–25; 258:1–4].

Whether happy or unhappy about relocating to Chattanooga, the children arrived there with their parents on September 21 or 22. [*Id.* at 33:14–16]. The family unloaded the children's and Mrs. Miller's belongings into Mrs. Miller's mother's basement, which became the children's new living space, but the family's belongings were so numerous that they had to unload some of them into local storage units. [*Id.* at 18:11–22; 19:3–7; 113:2–12]. Anna Miller described the basement as "chaotic," with "everything . . . just kind of piled on top of each other" and "little walking room." [*Id.* at 19:10, 11–14]. She testified that the children were "climbing over on top of everything, trying to get to a bed," [*id.* at 19:12–13], though she also testified that the house has a backyard for them to play in and is in a residential area, [*id.* at 39:8–13].[8] In fact, only a few days after the move, their cousins visited them, and together they played tag, football, and soccer in the

---

[6] Mr. Miller, in line with his witnesses' statements, testified that the children told him they considered Canada to be their "home" and "hate[d]" Chattanooga. [Tr. at 132:17–18]. He also testified that J.M.M. said he would "run away" from Chattanooga. [*Id.* at 132:20]. Mr. Miller's testimony, however, is inadmissible hearsay.

[7] According to Ms. Bunko, Mr. Miller told her that J.M.M. once suffered a "breakdown" in Canada because he missed his grandma and Chattanooga. [*Id.* at 201:1–4]. But this testimony is hearsay, too.

[8] Anna Miller sometimes contradicted her own testimony. She originally described the backyard in Chattanooga as "very small" but later conceded on cross-examination that the backyard was large. [*Id.* at 19:21; 39:12–13]. She also testified that the house was located "on a busy street with traffic" but then admitted that the house was located in a residential area. [*Id.* at 19:21–22; 39:8–11].

backyard. [*Id.* at 225:10–16; 231:14–25; 232:1–2]. Anna Miller, however, testified that the children could not play in the backyard because the family owns a large dog that defecates there. [*Id.* at 50:3–6].

Like Anna Miller, Mr. Miller viewed the basement as "cramped" and described it as "all one room, except for the bathroom." [*Id.* at 113:21; 115:24]. He testified that the children had trouble finding toys and clothes but had access to their Xbox through a television that had been set up for them. [*Id.* at 115:1, 24–25; 116:1–3]. Mr. Miller did not cohabitate with Mrs. Miller in the basement; they had agreed to maintain separate residences once they arrived in Chattanooga. [*Id.* at 161:9–11]. Mr. Miller moved in temporarily with Mr. Castle, who opened his home to him, while Mrs. Miller stayed at her mother's house with the children. [*Id.* at 18:25; 19:1–2; 71:25; 72:1–2].

Later in September, Mr. Miller enrolled J.M.M. and A.B.M. in school. [*Id.* at 148:7–12; Resp't's Ex. 2, at 1–2; Resp't's Ex. 3, at 1–2]. C.J.M. was not yet old enough to enroll. [*Id.* at 49:14–19]. Despite living apart from the children, Mr. Miller continued to see them at least two weeknights and most weekends. [Tr. at 26:6–9; 163:2–8]. He took them to the aquarium in September and during the fall. [*Id.* at 281:14–18]. Around this time, the children also made the first of several trips to Lookout Mountain, where they like to hike and see the waterfalls. [*Id.* at 261:1; 280:24–25; 281:1–8]. In October, the family had a birthday party for C.J.M., who turned five years old. [*Id.* at 21:1–7; 25:9–10; 40:8–10; 41:1–8]. Mrs. Miller invited her friends and other children to the party. [*Id.* at 21:8–11; 40:18–19]. Anna Miller also attended the party, and she testified

that C.J.M. had no friends there, though she later acknowledged that he had not yet been in Chattanooga long enough to make friends. [*Id.* at 21:18–20; 40:8–14].

After several weeks in Chattanooga, Mr. Miller noticed no improvement in his marriage, and he felt like he was "the only one trying" to salvage it. [*Id.* at 119:2–3]. He began to wonder whether "today [is] going to be the day that . . . a civil servant show[s] up" and "serve[s] [him] with papers." [*Id.* at 117:13–14, 18]. With these concerns in mind, he obtained legal advice from local attorneys, to ask them "what [he] can . . . do to protect [him]self." [*Id.* at 117:19–23]. The Hague Convention, which Mr. Miller had never heard of before, became a topic of conversation. [*Id.* at 131:11–18].

In November, Mrs. Miller told him that she wanted a divorce. [*Id.* at 22:21–25; 118:12–25; 119:1–11]. Within days of receiving this news, he returned to Canada and looked into resuming his old job and the availability of the family's old house. [*Id.* at 119:18–25; 120:6–10; 121:7–25; 122:1–25; 123:1–21]. In addition, he checked into the possibility of reenrolling the children in their old school in Humboldt and registering them for the hockey season. [*Id.* at 129:20–21]. Afterwards, he called Mrs. Miller, and he informed her that he "wanted to go back" to Canada and "wanted the boys to come back with [him]." [*Id.* at 129:15, 17–18]. According to Mr. Miller, Mrs. Miller expressed her desire for the children to remain in Chattanooga. [*Id.* at 129:16–18; *see id.* at 131:9–18].

While still in Canada, Mr. Miller did "homework" on the Hague Convention, and he pursued additional legal advice specifically relating to "how . . . it work[s]." [*Id.* at 131:19–21]. After receiving this advice, he had a conversation with the Kwasnicas and

told them that he was "bringing these boys home" under the Hague Convention. [*Id.* at 131:23–25; 132:1]. Despite this remark, he returned to Chattanooga without contacting the Saskatchewan Central Authority and requesting the children's return to Canada under the Hague Convention. [*Id.* at 132:2–13; 133:5–25].

In "October, November," A.B.M. began playing youth-league soccer. [*Id.* at 283:2–4; Resp't's Ex. 10, at 2]. According to Mrs. Miller, he "absolutely adores soccer." [Tr. at 282:22–23]. For Thanksgiving, Mr. Miller brought the children to Atlanta, where they spent the holiday with their grandparents, who had come to visit them "several times" since their return to Chattanooga. [*Id.* at 23:6–11; 23:15–16; 42:16–17]. Around the holiday, the children also had the chance to see their cousins from Florida, [*id.* at 263:18–23; 283:11–21], and Mrs. Miller, J.M.M., and a pair of relatives—one of whom is roughly J.M.M's age—attended a Tennessee Titans game. [*Id.* at 265:5–16; 285:5–14; Resp't's Ex. 11, at 6].

Sometime in December, Mrs. Miller received a call from Mr. Miller, and he told her that he was no longer willing to remain in Chattanooga and was planning to travel back to Canada. [*Id.* at 156:25; 157:1; 270:23–25; *see id.* at 72:9–23]. Mr. Miller asked her for the children's passports. [*Id.* at 156:24–25; 157:1]. Mrs. Miller, however, declined to produce their passports, and Mr. Miller left for Canada without them. [*Id.* at 112:18–20; 271:16–17].

On Christmas Day, Mr. Miller returned to Chattanooga and visited Mrs. Miller's mother's house for the first time in weeks. [*Id.* at 114:5–10]. He testified that some of the boxes in the basement—which continued to serve as the children's room—were still

unpacked, but he suggested that overall the basement had less clutter because the boxes had been pushed to the "perimeter of the room" and "in the corner of the room." [*Id.* at 114:11–19]. He also testified that three beds had been set up for the children. [*Id.* at 115:4–11]. To celebrate Christmas, Mrs. Miller's mother held a gathering—a holiday tradition—for the family at her house. [*Id.* at 225:1–9]. As a Christmas gift, Mrs. Miller received an annual membership to the Chattanooga Zoo, [*id.* at 230:6–8], which she and the children have attended since Christmas, [*id.* at 224:7–8; 261:3–4; 281:9–13]. Shortly before or after Christmas, the children again visited their grandparents in Atlanta, and they again saw their cousins from Florida. [*Id.* at 23:6–11; 42:19–20; 283:11–17].

Near the end of December, J.M.M. signed up for his school's Science Olympiad Club, an extracurricular activity that offers students the opportunity to perform science-related research and to build science projects. [*Id.* at 262:7–15; 282:7–12]. According to Mrs. Miller, J.M.M. "quite adores . . . science." [*Id.* at 262:12]. For New Year's Eve, the children were again bound for Atlanta to see their grandparents. [*Id.* at 133:20–25; 134:1–4]. On the first of the new year, Mrs. Miller enrolled the children in Tennessee healthcare plans. [*Id.* at 275:1–13; Resp't's Ex. 4, at 1; Resp't's Ex. 5, at 1].

Mrs. Miller testified that by the end of January 2018 the basement was almost unpacked and the children had access to "all the Legos, all the toys," in addition to the television and the Xbox. [Tr. at 232:8–17]. She also mentioned that the furniture in the basement included a couch and a loveseat. [*Id.* at 232:12]. Mrs. Miller's mother echoed her daughter's testimony, acknowledging that the basement was mostly unpacked and that the children have "a lot of toys" and "build their Legos." [*Id.* at 226:20–25].

Toward the end of January, Mr. Miller again obtained advice from an attorney—this time in Tennessee—about the Hague Convention. [*Id.* at 174:22–25; 175:1–9]. Then in late February or early March, he re-approached Mrs. Miller about the children's passports, requesting them this time so he could take the children to Canada for their upcoming spring break. [*Id.* at 135:19–25; 136:1–3; 270:13–16].[9] Their conversation led to a dispute about the passports, and Mrs. Miller continued to retain them. [*Id.* at 136:2–3; 147:20–24; 156:18–23; 269:22–25; 270:1–4]. So Mr. Miller instead made plans to bring the children to Florida for spring and stop en route in Atlanta, where they would spend Easter with their grandparents. [*Id.* at 135:2–6; *see* 23:2–11].

In early March, A.B.M. began the spring season of youth-league soccer, [*id.* at 282:24–25; 283:1], and J.M.M. began youth-league baseball, [*id.* at 24:19–21; 282:22–25; 282:1; Resp't's Ex. 10, at 1]. Later in the same month, not long before the children left for Florida, J.M.M. and Mrs. Miller attended a meeting for a playground-renovation project at J.M.M.'s school. [Tr. at 81:5–8]. Mr. Castle also happened to be present at the meeting and testified that J.M.M. was happy and excited about the school's renovation project. [*Id.* at 81:9–11]. Around this time, J.M.M. had a birthday, and Anna Miller traveled from Atlanta to Chattanooga to celebrate it. [*Id.* at 11:4, 7; 23:17–19].[10]

---

[9] Mr. Miller testified that the children told him that they wanted to go to Canada to see their friends for spring break. [*Id.* at 135:12]. This testimony is hearsay.

[10] Anna Miller testified that J.M.M. "did not have a party" and "did not want a party." [*Id.* at 24:12–13]. According to her, J.M.M. said, "Nana, I have one friend. Who am I going to invite?" [*Id.* at 24:14]. This testimony is hearsay. And incidentally, Mrs. Miller countered Anna Miller's testimony by indicating that J.M.M. did not want a birthday party because he "had a ball tournament that weekend." [*Id.* at 45:2–4]. Anna Miller confirmed that J.M.M. had a tournament that weekend. [*Id.* at 24:19–22].

On March 27, 2018, Mrs. Miller filed for divorce. [Resp't's Ex. 7, at 1–29]. On the same day, Mr. Miller contacted the Saskatchewan Central Authority and applied for the children's return to Canada. [Tr. at 175:24–25; 176:1–6; Pet'r's Ex. 11, at 6]. After making the trip back from Florida a few days later, Mr. Miller arrived at Mrs. Miller's mother's house to drop off the children. [Tr. at 273:16–25; 274:1–11]. He fled from the house—with the children—after learning that a process server was waiting there to serve him. [*Id.* at 273:16–21; 274:7–11; Resp't's Aff., doc. 28-1, ¶10]. Mrs. Miller testified that Mr. Miller refused to return the children to her until she instructed the process server to leave. [Tr. at 274:10–11].

Mrs. Miller testified that J.M.M., after coming back from Florida, said "out of nowhere" that he was under the impression that the family's return to Chattanooga was temporary. [*Id.* at 269:9–10]. Mrs. Miller believes, however, that Mr. Miller, while he had one-on-one access to J.M.M. in Florida, coached him to question the permanency of the move to Chattanooga. [*Id.* at 268:23–25; 269:1–21]. Supporting this belief, she testified that the children have typically mentioned Canada only to discuss differences between life in Chattanooga and life in Canada, or when reacting to her discipline, which usually consists of the confiscation of their laptop or Xbox. [*Id.* at 268:9–12].

Finally, during the course of all these events—which occurred roughly between September 2017 and March 2018—the bulk of the evidence indicates that the children had made friends in Chattanooga. Although Anna Miller testified that the children "had no friends" between November 2017 and May 2018, Mrs. Miller and even Mr. Miller testified differently. [*Id.* at 24:8–12]. Mrs. Miller stated that the children have friends at

their school and that they come over to the house to play. [*Id.* at 261:10–13]. She also testified that the children have "socialized with children of all different ages." [*Id.* at 261:21–22]. Similarly, Mr. Miller acknowledged that the children "hang out with the two little girls that live next door to them" and "with [Mrs. Miller's] girlfriends and their kids." [*Id.* at 140:14–16]. He also agreed that J.M.M. and A.B.M. are "nice children" and that "it would stand to reason" they have made friends at school. [*Id.* at 140:21–25]. He testified that the children have even talked about some of these friends. [*Id.* at 141:1–2].

As the children's resident parent, Mrs. Miller believes the children are "happy." [*Id.* at 267:22–23]. Their grades are strong. [*Id.* at 260:14–17; 267:24–25]. J.M.M. has made A's and high B's, and A.B.M. has demonstrated increasing levels of proficiency in reading. [*Id.* at 260:14–17]. They have no behavioral issues. [*Id.* at 268:7–8]. They do not bite their nails or wet the bed. [*Id.* at 268:1–4]. They have no need for counseling or therapy. [*Id.* at 268:5–6]. To this day, Mr. Miller resides in Canada, in the same house that he once lived in with his family. [*Id.* at 84:21–22; 59:16–25]. Mr. Miller's employer bought that house and uses it as residence for its construction workers, several of whom live there with Mr. Miller. [*Id.* at 62:22–25; 63:1–15]. Mr. Miller now asks the Court to harness its powers under the Hague Convention and send the children back to that house, with immediate effect.

### III.   CONCLUSIONS OF LAW

In 1988, the United States ratified the Hague Convention, a multilateral treaty, through its treaty-making process. To make it enforceable in federal court, Congress

passed the Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011, as its implementing legislation, giving it the imprimatur of federal law. *See Medellin v. Texas*, 552 U.S. 491, 506 n.2 (2008) ("[A] 'non-self-executing' treaty does not by itself give rise to domestically enforceable federal law. Whether such a treaty has domestic effect depends upon implementing legislation passed by Congress."); *Ozaltin v. Ozaltin*, 708 F.3d 355, 359–60 (2d Cir. 2013) (commenting that the Hague Convention as a whole is not self-executing); *see also* 22 U.S.C. §§ 9001(b)(1), (2) (establishing "procedures for the implementation of the Convention," "in addition to and not in lieu of the provisions of the Convention"). Both the United States and Canada are signatory nations to the Hague Convention. [Letter from the State Department to the Court (May 15, 2018) (on file with the Court)].

When preparing to conduct an analysis under the Hague Convention, courts usually begin with its purpose. *See Chafin v. Chafin*, 568 U.S. 165, 168 (2013); *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007). In 1980, the Hague Convention's drafters met with the intention of pursuing "an international solution to an emerging problem: transborder child abductions perpetrated by noncustodial parents." *Abbott v. Abbott*, 560 U.S. 1, 24 (2010) (Stevens, J., dissenting) (citing Elisa Perez-Vera, *Explanatory Report*, *in 3 Actes et Documents de la Quatorziéme Session*, ¶ 11 (1982) [hereinafter *Perez-Vera Report*])). The drafters' primary aspiration was to prevent "noncustodial parents" from trying to "circumvent adverse custody decrees (*e.g.*, those granting sole custodial rights to the other parent)" in one country by removing a child to a different country where a more favorable judgment is possible. *Id.* (citing *Perez-Vera Report* ¶ 14); *see Friedrich*

15

*v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (stating that "a primary purpose" of the Hague Convention is "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court").

In keeping with this purpose, the drafters—in the Hague Convention's opening lines—heralded an intent "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the state of their habitual residence." Hague Convention, preamble. For left-behind parents, the upshot of the drafters' efforts is that they may bring a federal suit for the "prompt return" of a child who has been "wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9001(a)(4); *see id.* § 9001(b)(4); Hague Convention, art. 2.[11] A child's removal or retention is "wrongful" when:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.

A parent requesting a child's return under the Hague Convention carries the burden of establishing wrongful removal or wrongful retention by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A). Mr. Miller styles this case as one of wrongful

---

[11] In lieu of a federal suit, they may bring suit under the Hague Convention in state court. *See* 22 U.S.C. § 9003(a) ("The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention.").

retention, not wrongful removal. [*See* Am. Pet. ¶ 4 ("Mother has illegally and wrongfully retained the Children in the United States, away from their proper custodial and habitual residence in Canada.")]. Based on Mr. Miller's depiction of this case, the Court will treat it as a wrongful-retention case. *See Ahmed v. Ahmed*, 867 F.3d 682, 684 n.1 (6th Cir. 2017) ("This is a wrongful retention rather than a wrongful removal case because [the petitioner] claims his wife is keeping their children without his consent, but not that she took them without his consent." (citation omitted)).

### A. Mr. Miller's Petition

In case law, the Sixth Circuit has not only recognized the Hague Convention's purpose but also balked at straying from it. *See Friedrich*, 983 F.2d at 1400 (declining to apply the Hague Convention in a way that "would be contrary to [its] primary purpose"); *see also Jenkins v. Jenkins*, 569 F.3d 549, 557–58 (6th Cir. 2009) (reiterating the need for fidelity to the Hague Convention's purpose, which was "particularly relevant in the circumstances" because "[the petitioner] was likely engaging in forum-shopping when she petitioned the court to declare Israel to be [the child's] habitual residence"); *cf. Abbott*, 560 U.S. at 9–10 ("The question is whether [the child] was 'wrongfully removed' from Chile," and "[t]his Court's inquiry is shaped by . . . the purposes of the Convention."); *see generally Kolovrat v. Oregon*, 366 U.S. 187, 193–95 (1961) (conducting an analysis with deference to a treaty's purpose). The Sixth Circuit's reluctance to veer from the Hague Convention's purpose makes a firm impression on the Court in this case. When the Court considers its factual findings and measures them

against the backdrop of the Hague Convention's purpose, it has misgivings about whether the Hague Convention should apply to this case at all.

Mr. Miller indisputably agreed to leave Canada and return to Chattanooga with his family, out of concern for Mrs. Millers' mental health and out of hope to boost their marriage. [Tr. at 110:4–22; 149:5–8; 151:6–12]. The Millers' departure from Canada had every semblance of permanency. They packed all their belongings—so many that they actually had to unload some of them into storage facilities, [*id.* at 33:17–25; 34:1; 57:8–13; 71:4–11; 149:1–8; 199:1–7]—and they sold or gave away the belongings that they were unable to pack, [*id.* at 197:17–20; 199:13–14; 256:9–16]. They cleaned out their house. [*Id.* at 57:8–13; 64:24–25; 65:1–2; 149:13–14; 256:15–17]. They canceled the utilities. [*Id.* at 256:20–21]. They returned the keys. [*Id.* at 111:2–3]. Mr. Miller resigned from his job. [*Id.* at 149:9–10]. The Millers' friends threw farewell parties for them, with going-away gifts. [*Id.* at 150:7–11; 197:21–24; 198:11–22; 257:12–22]. Other than claiming that one of these parties was actually a birthday party and not a farewell party, Mr. Miller opposes none of these facts:

> Q: You uprooted your family, by agreement, and brought them to Chattanooga, lock, stock, and barrel, with two U-Haul trucks filled to the brim. Isn't that right?
>
> A: Yes, we did.
>
> Q: You quit your job, correct?
>
> A: Yes, I did.
>
> Q: You had friends help you clean the house out completely. Isn't that right?

A: Yes, we did.

[*Id.* at 149:5–13].

After returning to Chattanooga, Mr. Miller continued to see the children, at least two weeknights and most weekends. [*Id.* at 26:6–9; 163:2–8]. But when his marriage did not improve, he feared a divorce was imminent. [*Id.* at 117:13–14, 18]. Once Mrs. Miller told him that she did in fact want a divorce, he left Chattanooga, made preparations for the family's return to Canada, and told Mrs. Miller that he "wanted the boys to come back [to Canada] with [him]." [*Id.* at 129:15, 18–19].

These facts—an agreement between estranged custodial parents to relocate to another country and divide their time between their children, with one parent later becoming discontent with that arrangement—do not comprise the sort of scenario that the United States intended to address by signing the Hague Convention. *See* Hague International Child Abduction Convention; Text and Analysis, 51 Fed. Reg. 10494, 10503 (Mar. 26, 1986) (offering the State Department's opinion that wrongful retention, in its "archetyp[al]" form, "is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period" [hereinafter Text and Analysis]); *see Kolovrat*, 366 U.S. at 194 ("[T]he meaning given [to treaties] by the departments of government particularly charged with their negotiation and enforcement is given great weight." (footnote omitted)).

The Court, however, is mindful that in commenting about the parties' agreement to relocate to Chattanooga, it is coming precariously close to touching on their shared parental intent. *See Mozes v. Mozes*, 239 F.3d 1067, 1076–77 (9th Cir. 2001) ("[W]hen

both parents and the child translocate together under circumstances suggesting that they intend to make their home in the new country," courts "are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose." (footnote omitted)). The Sixth Circuit has expressly prohibited courts in this circuit from considering parents' shared intent when adjudicating a petition under the Hague Convention, *Robert*, 507 F.3d at 990–93, except in specific circumstances, *Ahmed*, 867 F.3d at 690. Mindful of the Sixth Circuit's jurisprudence, the Court leaves its misgivings about the parties' agreement here at the doorstep of its opinion, taking them no further beyond this point. *But see Jenkins*, 569 F.3d at 555 (stating that "there was no wrongful removal or retention, simply because . . . the parents[] [made a] mutual decision to relocate [the child] from Israel to the United States").

But this is not to say the Court has to ignore the parties' conduct after their return to Chattanooga. Indeed, it cannot, partly because the record suggests that Mr. Miller initiated this case with the intent to forum shop—to postpone or circumvent custody-related proceedings in Tennessee and arrange for them to occur, if at all, in only one possible location, Canada. Again, Mr. Miller was apprehensive that Mrs. Miller was preparing to have him served with divorce papers, and one day, when he suspected a process server was parked outside her mother's house, he reacted by "t[aking] off with the children." [Tr. at 274:9–10; *see id.* at 117:13–14, 18]. According to Mrs. Miller, he refused to return the children until she directed the process server to leave. [*Id.* at 274:10–11].

In an act illustrative of an endgame to stall entry of a potential custody decree in Tennessee, he contacted the Saskatchewan Central Authority and filed his request for the children's return to Canada on the very same day that Mrs. Miller initiated divorce proceedings in the Hamilton County Circuit Court. [Tr. at 175:24–25; 176:1–2; Pet'r's Ex. 11, at 6; Resp't's Ex. 7, at 1, 4, 16].[12] By every appearance, his request halted the proceedings in Hamilton County Circuit Court. *See* Hague Convention, art. 16 (stating that a court of a signatory nation "shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention"); [*see also* Pet'r's Trial Br. at 5–6 (informing this Court that the State Department has notified the Hamilton County Circuit Court of Mr. Miller's Petition as well as Article 16's requirement for the suspension of custody-related proceedings)].

From this evidence, the Court has a hardened conviction that Mr. Miller invoked the Hague Convention to duck the proceedings in Hamilton County Circuit Court and place Mrs. Miller in the difficult position of having to pursue those proceedings in his preferred forum, Canada. After all, once Mrs. Miller informed him of her intention to legally end their marriage in November 2017, [Tr. at 22:21–25; 118:12–25; 119:1–11], he resolved to acquire knowledge of the Hague Convention and "how it . . . work[s]," having "done homework" on it and acquired legal advice. [Tr. at 131:16–25; 132:1; 174:19–25; 175:1–9]. The evidence supporting the Court's conviction of forum shopping is by itself a basis for denial of his Petition. *See Jenkins*, 569 F.3d at 557–58 (stating that

---

[12] The Court does not raise the issue of forum shopping on a sua sponte basis. During the trial, Mrs. Miller aspersed Mr. Miller's same-day filing, calling it "retaliatory." [Tr. at 147:6, 20].

the district court "appropriately recognized the limits placed on the scope of its inquiry by the Convention" and that "there was no error in the district court's failure to engage in a more detailed" analysis in light of evidence that the petitioner was likely "engaging in forum shopping").

Although Mr. Miller maintains that Mrs. Miller is actually the party who engaged in forum shopping because she secretly harbored a desire to divorce him and withheld that desire from him until she secured the family's arrival in Chattanooga, her forum of preference, [Def.'s Proposed Findings at 18, 24], the record lacks grist to support his position. Mr. Miller testified that before leaving Canada he knew his marriage was "on the rocks." [Tr. at 109:23]. And in the days before leaving Canada, he did not appear to be particularly optimistic that the move to Chattanooga would bolster their marriage, having described the move as "a death sentence." [Resp't's Ex. 13, at 29].[13] Mr. Miller's testimony and bleak outlook on the move are consistent with Mrs. Miller's testimony that in February 2017, while the family was still living in Canada, she told Mr. Miller that they were headed for a divorce. [*Id.* at 242:5–16]. They even agreed in advance that they would live separately from each other in Chattanooga. [*Id.* at 161:9–11]. None of this evidence realistically shows that Mrs. Miller somehow snookered Mr. Miller into leaving Canada by providing him with false hope that their marriage would regain

---

[13] Although this out-of-court statement totters on hearsay, Mrs. Miller did not offer it to prove the truth of the matter asserted—that is, that the impending move felt like a death sentence to Mr. Miller. Instead, she offered it to show that Mr. Miller, despite this statement, remained "on board with moving, lock, stock, and barrel, back to Chattanooga." [*Id.* at 255:14–16].

traction later. And Mr. Miller now concedes, as he must, that Mrs. Miller "made no promises that the marriage would be mended." [Pet'r's Proposed Findings at 18].

By reaching a conclusion otherwise, the Court would effectively allow Mr. Miller to turn the Hague Convention against itself, to use it as an apparatus to carry out the very thing that its drafters viewed as a bane: the shuttling of children across international borders to a country where a custody-related conflict may be more preferential for one parent than the other. *Friedrich*, 983 F.2d at 1400; *see Abbott*, 560 U.S. at 24 (Stevens, J., dissenting) (recognizing the drafters' "primary concern" of preventing parents from trying to "circumvent adverse custody decrees" (citing *Perez-Vera Report* ¶ 14)). Still, the Court—without drawing the curtain on the specter of forum shopping and its belief that it ought to ground this case—will go on to address Mr. Miller's Petition on the merits, to which the parties have devoted significant argument.

### B. Wrongful Retention

To establish wrongful retention under the Hague Convention, Mr. Miller must prove first by a preponderance of the evidence that Canada is the children's country of habitual residence. *Friedrich*, 983 F.2d at 1400; *Guevara*, 180 F. Supp. 3d at 525; Hague Convention, art. 3; *see generally* Text and Analysis, 51 Fed. Reg. at 10504 ("In practical terms, the Convention may be invoked only where the child was habitually resident in a Contracting State and taken to or retained in another Contracting State."). If he succeeds in establishing that Canada is the children's country of habitual residence, he must then prove by a preponderance of the evidence that (1) Mrs. Miller, by retaining the

children in Chattanooga, breached his custody rights under Canadian law and (2) at the time of their retention, he was actually exercising those rights, or would have exercised them if not for their retention. *Friedrich*, 983 F.2d at 1400; *Guevara*, 180 F. Supp. 3d at 525; Hague Convention, art. 3.

The Hague Convention does not define "habitual residence," placing courts in a position to bring illumination to it. About twenty-five years ago, the Sixth Circuit had its initial encounter with the Hague Convention in *Friedrich*, a case in which it determined the habitual residence of a child who had resided exclusively in Germany throughout his life until his mother removed him to the United States. 983 F.2d at 1398–99. In shaping its analysis, the Sixth Circuit identified five lodestars to guide itself—and district courts in future cases—to a proper determination of a child's habitual residence:

> First, habitual residence should not be determined through the "technical" rules governing legal residence or common law domicile. Instead, courts should look closely at "[t]he facts and circumstances of each case." Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. Third, this inquiry should focus exclusively on the child's "past experience." "Any future plans" that the parents may have "are irrelevant to our inquiry." Fourth, "[a] person can have only one habitual residence." Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only "a change in geography and the passage of time" may combine to establish a new habitual residence.

*Robert*, 507 F.3d at 989 (quoting *Friedrich*, 983 F.2d at 1401–02). The Sixth Circuit, however, ultimately reasoned that *Friedrich* was a "simple case" because the child was born in Germany and exclusively resided there until his mother removed him to the

United States. *Friedrich*, 983 F.2d at 1402. It therefore concluded that the child's habitual residence was Germany. *Id.*

About a decade later, in *Robert v. Tesson*, the Sixth Circuit revisited the issue of habitual residence in a more complex context, addressing how to determine habitual residence "when a child has alternated residences between two or more nations." 507 F.3d 992. Concerned with the need for emotional and social stability in a child's life, the Sixth Circuit adopted an "acclimatization standard." *Id.* at 993. Under this now well-known standard, "a child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'" *Id.* (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)). The Sixth Circuit has not fitted the terms "acclimatization" or "settled purpose" with a tailored definition because every inquiry into habitual residence is a pliant, fact-specific analysis. *See id.* at 990 (stating that an analysis of a child's habitual residence is not a formulaic one and requires courts to "look closely at '[t]he facts and circumstances of each case'" (quotation omitted)); *Friedrich*, 983 F.2d at 1402 ("Every family dispute has its own unique set of facts.").

Under this fact-specific inquiry, various aspects of a child's life may be pertinent to reaching a decision as to whether a child has become acclimated to and settled in a particular country. They include the child's academic activities, social engagements, participation in sports programs and excursions, any personal belongings in the child's possession when the child alternated residences, the child's own stated desire, and any other relevant circumstances or meaningful connections with people or places. *Robert*,

507 F.3d at 996; *see Jenkins*, 569 F.3d at 556 ("[A]ll [of these things] point to the child being acclimatized." (quotation omitted)). But all of these aspects surrounding a child's life in a new country, depending on the time of their occurrence, are not necessarily proper for consideration in an analysis under the acclimatization standard.

A lynchpin of any inquiry under this standard is a determination of the time of the wrongful removal—or in this case, the time of the wrongful retention—because it lays the parameters for the Court's analysis. *See Robert*, 507 F.3d at 993 ("[A] child's habitual residence is the country where, *at the time of their removal*, the child has been present long enough to allow acclimatization[.]" (emphasis added) (quotation omitted)); *see also Panteleris v. Panteleris*, 601 F. App'x 345, 349 (6th Cir. 2015) ("[O]ur court's precedent instructs courts to look back in time from the period of wrongful retention, not forward."); *Friedrich*, 983 F.2d at 1401 ("[T]he court must focus on the child, not the parents, and examine past experience, not future intentions."). In other words, the date of the children's retention in Chattanooga operates as an expiration point, which means that the Court, when determining the children's habitual residence, has to limit its review to the social and familial aspects of the children's lives that developed before that point and not beyond it.

Mr. Miller contends that Mrs. Miller began wrongfully retaining the children in Chattanooga on November 17, 2017, because on this date he expressed a desire to have the children return to Canada with him and Mrs. Miller expressed her desire for them to remain in Chattanooga with her. [Pet'r's Proposed Findings at 18, 19]. The Court presumes that Mr. Miller is referring to the conversation in which he told Mrs. Miller

that he "wanted to go back" to Canada and "wanted the boys to come back with [him]," because this conversation occurred in November 2017. [Tr. at 129:15, 18–19]. In maintaining that Mrs. Miller's wrongful retention of the children began on this date, he points out that "[w]rongful retention involves 'keeping the child without the consent of the person who was actually exercising custody." [Pet'r's Trial Br. at 9 (quoting *March v. Levine*, 136 F. Supp. 2d 831, 835 (6th Cir. 2000))]. With this assertion, he appears to urge the Court to rule that the date of wrongful retention is the date when he withdrew his permission for the children to remain in Chattanooga, though he does not cite case law for this proposition.

If the Court were to accept Mr. Miller's argument that the date of wrongful retention is November 17, 2017, it would necessarily have to disregard an assortment of the children's activities, familial interactions, newly formed friendships, and other relevant circumstances like their enrollment in Tennessee healthcare plans. Several of these social and familial aspects of their lives in Chattanooga—including their visits to the aquarium, J.M.M.'s attendance at a meeting for a playground-renovation project at his school, J.M.M.'s registration for the Science Olympiad Club, J.M.M's and A.B.M's participation in spring-league sports, and rounds of face-to-face time with friends and relatives—occurred after November 17, 2017. In response, Mrs. Miller angles for a broader analysis that is inclusive of evidence through March 27, 2018, which, again, is the date when Mr. Miller petitioned the Saskatchewan Central Authority and requested the children's return to Canada. [Resp't's Proposed Findings at 10].

"Determining the date of wrongful retention often proves more difficult than determining the date of wrongful removal for one obvious reason: wrongful retention, in many instances, cannot easily be reduced to a discrete moment in time." *McKie v. Judge*, No. 10-103-DLB, 2011 WL 53058, at *6 (E.D. Ky. Jan. 7, 2011). The Sixth Circuit has not yet offered district courts specific guidance as to how to pinpoint a date of wrongful retention. Several district courts, inside and outside this circuit, have espoused the view that the date of wrongful retention occurs when a non-abducting parent is clearly or unequivocally on notice that the abducting parent does not intend to return a child from his current country. *See id.* ("[T]o determine the date of wrongful retention courts will look to the date where the non-abducting parent was truly on notice that the abducting parent was not going to return with the child." (citation omitted)); *Blanc v. Morgan*, 721 F. Supp. 2d 749, 756, 761 (W.D. Tenn. 2010) (concluding that the date of wrongful retention occurred when the "[m]other made explicit her intention" to retain the child by telling the father that she "no longer wanted to go back to France and was going to stay in the [United States] with the child"); *see also In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1313 (S.D. Fla. 2004) (determining that the father should have known that the mother was wrongfully retaining the child when she did not return the child at the end of the school year after previously agreeing to do so); *Zuker v. Andrews*, 2 F. Supp. 2d 134, 140 (D. Mass. 1998) (concluding that the mother "clearly communicated" her refusal to return the child to Argentina once she and the child stopped staying at a relative's house in the United States and moved into their own apartment); *Slagenweit v. Slagenweit*, 841 F. Supp. 264, 270 (N.D. Iowa 1993) ("The wrongful retention does not begin until the

noncustodial parent . . . clearly communicates her desire to retain custody and asserts her parental right to have [her child] live with her.").

In *Karkkainen v. Kovalchuk*, 445 F.3d 280 (3d Cir. 2006), a widely cited case that the Sixth Circuit has praised as a source of "helpful guidance," *Robert*, 507 F.3d at 995, the mother invoked the Hague Convention to seek her child's return to Finland, claiming the father was wrongfully retaining her in the United States, 45 F.3d at 284–87. The parties disputed the date of wrongful retention. *Id.* at 290. The district court determined that the date of wrongful retention took place when the mother filed her petition under the Hague Convention, because it "unequivocally signaled her opposition to [the child's] presence in the United States" and left no room to "doubt that [the child] remained with her father against her mother's wishes." *Id.* But on appeal, the mother argued that she had withdrawn her consent for the child to remain in the United States before filing her petition. *Id.*

The Third Circuit held that "it was clearly erroneous for the District Court to find that [the mother] had not clearly communicated her opposition to [the child's] presence in the United States until she filed the petition for return." *Id.* In reaching this decision, the Third Circuit homed in on two pieces of evidence. First, before the mother initiated her claim under the Hague Convention, the child had a plane ticket to Finland in her possession. *Id.* The Third Circuit reasoned that the ticket "suggest[s] that the parties did not intend [her] to remain in the United States indefinitely." *Id.* Second, several weeks before the mother filed her petition, she and the father exchanged an e-mail in which she insisted that the child's ongoing presence in the United States would be tantamount to

kidnapping. *Id.* According to the Third Circuit, these two pieces of evidence established that "there was [no] confusion about [the mother's] opposition" before the filing of her petition. *Id.* Although the Third Circuit did not expressly hold that the date of wrongful retention is the date when a parent "unequivocally communicates his or her desire to regain custody," it did state that it "assume[s] that this standard applies." *Id.*

Mr. Miller appears to encourage the Court to apply a standard generally similar to the one that steered the Third Circuit's analysis in *Karkkainen*, contending that he "no longer agreed to allow" the children to live in Chattanooga and that he "communicated" this decision to Mrs. Miller on November 17, 2017, "thus beginning the unlawful retention." [Pet'r's Proposed Findings at 18]. On this date, however, he made no more than a tepid communication of his desire for the children to return to Canada, and the record certainly lacks evidence of any forceful communication, like his belief that their presence in Chattanooga constitutes kidnapping. Mr. Miller's statement that he "wanted the boys to come back with [him]" reads merely as an expression of his preference—not a clear or explicit demonstration of opposition to the status quo—and Mrs. Miller's response reads merely as an expression of her preference otherwise.

In fact, the record is barren of any meaningful evidence showing that he objected to the children's presence in Chattanooga. He returned to Canada in December 2017 with knowledge of the Hague Convention and professional advice in hand yet did not pursue recourse under it. *Cf. Moreno v. Zank*, 895 F.3d 917, 925 (6th Cir. 2018) ("By failing to pursue his legal remedy, [the father] enabled [the child] to obtain a habitual residence in the country to which her mother took her, even if the initial taking was wrongful."

(quoting *Kijowska v. Haines*, 463 F.3d 583, 589 (7th Cir. 2006))). Instead, he operated in essentially the same way that he had while in Chattanooga during the two prior months—abiding by an agreement to maintain a residence away from Mrs. Miller and see the children periodically. *Cf. Toren v. Toren*, 191 F.3d 23, 28 (1st Cir. 1999) (stating that "the children's mere presence in the United States cannot constitute a retention because it is entirely consistent with the parties' [visitation] agreement").

Although he was not necessarily content with this agreement, he did appear to be tolerant of it. For instance, when he left for Canada, he "asked for" the children's passports—suggesting deference and not opposition. [Tr. at 156:25]. And at Christmas, he traveled back to Chattanooga, where he visited the children and even spent time with them at Mrs. Miller's mother's house, without any evidence that he and Mrs. Miller broached—let alone quarreled about—whether the children should continue to reside there or instead return to Canada. [*Id.* at 114:5–10]. The record also lacks any evidence that they discussed the children a few days later, when Mr. Miller picked them up for their trip to Atlanta on New Year's Eve. [*Id.* at 133:20–25; 134:1–4].

In late February or early March 2018, Mr. Miller again requested the children's passports from Mrs. Miller, but not because he was adamant that she was unjustly keeping the children in Chattanooga but because he hoped to take them to Canada for their spring break. [*Id.* at 135:19–25; 136:1–3; 270:13–16]. Although his request did lead to a dispute, [*id.* at 269:22–25], Mrs. Miller downplayed its severity—at least as it related to the children's place of residence—testifying that Mr. Miller did not demand the children's return to Canada, [*id.* at 270:10–13, 20–22], and he "just wanted their

passports," [*id.* at 270:12]. Mr. Miller appeared to agree with her testimony about the nature and extent of their dispute. He simply conceded that he and the children had limitations on what they were "allowed to do" during spring break. [*Id.* at 135:8]. By making arrangements to spend spring break elsewhere and choosing not to press the matter further—with, for example, some kind of appreciable challenge to the children's presence in Chattanooga, whether verbal or otherwise—he plainly accepted those limitations. Simply, his words and actions again illustrate that he displayed something much more akin to deference or even resignation to Mrs. Miller's refusal to yield the passports, rather than opposition.

All this evidence leads the Court to only one possible conclusion: the first time that Mr. Miller expressed anything weightier than tacit grumblings about the children's presence in Chattanooga is when he pursued their return to Canada on March 27, 2018, by filing his application with the Saskatchewan Central Authority. And on this date— the same date when Mrs. Miller filed for divorce—Mrs. Miller had also announced her unequivocal intention to retain the children in Chattanooga through state custody proceedings. Her court filings in fact included a "Proposed Temporary Parenting Plan," in which she requested the imposition of custody-related restrictions against Mr. Miller under Tennessee law. [Resp't's Ex. 7, at 5–11].

Having determined the date of the children's retention, the Court—when it looks backward from that date—has no doubt that the children were present in Chattanooga long enough to become acclimated and settled. With the exception of C.J.M., who was too young, they are enrolled in Chattanooga's school system, and J.M.M. became a

member of the Science Olympiad Club and attended a playground-renovation project meeting. *See Ahmed*, 867 F.3d at 687 ("'[A]cademic activities' are 'highly suggestive of acclimatization[.]'" (quotation omitted)). They are doing well in school and show no behavioral problems. *See Jenkins*, 569 F.3d at 556 (holding that a child was acclimated to his new country partly because he "was attending preschool . . . and was, by all first-person accounts, doing well in that environment").

They also have family in the area and interact with them. For instance, they traveled to see their grandparents in Atlanta at least four times, by the Court's count, and met with their cousins on at least three occasions. *See Robert*, 507 F.3d at 996 (finding that children were acclimated to their new country partly because they "visited their maternal grandmother in Baton Rouge").[14] They have friends in their neighborhood and their school. They frequent the aquarium, the zoo, and Lookout Mountain, where they like to hike trials and observe the waterfalls. *See Jenkins*, 569 F.3d at 556 (determining that a child was acclimated to his new country partly because he enjoyed regular visits to the Air Force museum and to fountains in a water park). J.M.M. saw the Titans play in a home game, and J.M.M. and A.B.M. play sports. *See id.* ("[S]ocial engagements, participation in sports programs and excursions, and meaningful connections with the people and places in the child's new country all point to the child being acclimatized." (quotation omitted)).

---

[14] Their grandparents also traveled from Atlanta to Chattanooga to see them "several times." [*Id.* at 23:15].

In addition, Mr. Miller concedes that the family packed everything, including all the children's belongings, when they departed Canada for Chattanooga—evidence that underscores a settled purpose from the children's perspective. *See id.* at 557 (stating that the district court "accurately noted that *all* of [the child's] personal belongings . . . were in . . . Ohio, evidencing a 'settled purpose' to reside in the United States from the child's perspective"). They also sold or gave away everything that did not fit into the U-Haul trucks—evidence that is indicative of a settled purpose, too. *See id.* ("Indeed, as noted in trial testimony, any belongings that the family could not bring with them from Israel to the United States had been sold, given away, or thrown away.").

Although the process of unpacking all the children's belongings did take some time, they had access to their Xbox right away, and the evidence shows they had access to all their toys before the date of retention. The basement may be less spacious than their rooms in their Canadian home, but it is hardly so inadequate as to deprive them of the ability to form a settled purpose there, especially in light of the fact that they have their own beds, toys, a couch, a bathroom, a television, and a backyard. *See Robert*, 507 F.3d at 998 (stating that children could not form a settled purpose in a home with so many structural defects that it was a "hazard-riddled construction site"). And despite testifying that the children were unable to play in the backyard because the family has a large dog that defecates there, Anna Miller later recognized that the same dog lived with the family in Canada, presumably in the backyard. [Tr. at 39:14–19; 50:3–6].

Even if the Court were to accept Mr. Miller's argument that November 17, 2017, is the date of wrongful retention, it would still be unconvinced that the children were

unacclimated or lacked a settled purpose in Chattanooga by that time. For nearly every piece of evidence that Mr. Miller introduced to tab Canada as the children's habitual residence, a contrary piece of evidence exists to establish Chattanooga as their habitual residence. The children had substitute "grandparents" in Canada, but once they arrived in Chattanooga, they became reunited with their actual grandmother and, days later, played with their cousins in the backyard. J.M.M. and A.B.M. were enrolled in school in Canada, but they began school in Chattanooga by the end of September. The children participated in outdoor activities in Canada, but they made the first of many excursions to Lookout Mountain and the aquarium in September 2017. J.M.M. and A.B.M. played hockey in Canada, but A.B.M. transitioned to soccer after arriving in Chattanooga—no later than November and possibly as early as October. And again, the family packed all the children's belongings when they departed for Chattanooga, "evidencing a 'settled purpose' to reside in the United States from the child's perspective." *Jenkins*, 569 F.3d at 556.

Simply, when the Court juxtaposes the children's lives in Canada with their lives in Chattanooga before November 17, 2017, the evidence is a wash at best. As the petitioner, Mr. Miller has to do more than merely trade evidence with Mrs. Miller; he has to demonstrate by a *preponderance* of the evidence that Canada is the children's habitual residence. *See Ahmed*, 867 F.3d at 691 (Smith, J., concurring) ("I agree that we must affirm the district court because [the petitioner] cannot establish, by a preponderance of the evidence, that the United Kingdom was the children's habitual residence."); *Robert*, 507 F.3d at 996–98 (observing that "some of these factors cut in

both directions" and ultimately holding that the petitioner failed to meet his burden by a preponderance of the evidence).

Although by November 17, 2017, the children had been in Chattanooga for no more than two months, this interval—based on the Court's fact-specific inquiry—is not too small to constitute a satisfactory passage of time for acclimatization. *See March*, 135 F. Supp. 2d at 838 (recognizing that a child must be in a country only for that amount of time necessary for him to achieve acclimatization and a degree settled purpose based on his past experiences); *Brooke v. Willis*, 907 F. Supp. 57, 61 (S.D.N.Y. 1995) ("Place of habitual residence is determined more by a state of being than by any specific period of time; technically, habitual residence can be established after only one day as long as there is some evidence that the child has become 'settled' into the location in question." (citation omitted)); *see also In re Bates*, No. CA 122.89, 9–10, High Court of Justice, Family Div'n Royal Court of Justice, United Kingdom (1989) ("It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence . . . . The facts and circumstances of each case should continue to be assessed without resort to presumptions or presuppositions."). In sum, Mr. Miller fails to prove that Canada was the children's country of habitual residence at the time of their retention in Chattanooga, and the Court's analysis must therefore end here.

## IV. CONCLUSION

Mr. Miller fails to establish by a preponderance of the evidence that Canada was the children's habitual residence at the time of their retention in Chattanooga—whether

the Court views the date of retention as March 27, 2018, or November 17, 2017. Their retention in Chattanooga is therefore not "wrongful" as the Hague Convention defines the term. The Court will **DENY** Mr. Miller's Amended Petition for Return of Children to Canada [doc. 38] and Mr. Miller's Motion for Preliminary Injunction [doc. 8], and it will enter an order consistent with this opinion.

_____s/ Thomas W. Phillips_____
United States District Judge